IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2016

**STATE OF TENNESSEE v. PAUL BRENT BAXTER**

**Appeal from the Circuit Court for Bedford County**
**No. 17832     Forest A. Durard, Jr., Judge**

———————————

**No. M2015-00939-CCA-R3-CD – Filed May 16, 2016**

———————————

The Defendant, Paul Brent Baxter, appeals as of right from his jury convictions for aggravated assault and aggravated kidnapping. Following a sentencing hearing, the trial court imposed consecutive terms of fifteen years and twenty years, respectively. On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that his effective thirty-five-year sentence is excessive. After a review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Donna Orr Hargrove, District Public Defender; and Andrew Jackson Dearing III (at trial and on appeal) and Michael J. Collins (at trial), Assistant District Public Defenders, for the appellant, Paul Brent Baxter.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Robert J. Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from a November 2013 domestic dispute between the Defendant and his ex-girlfriend, Emma Christina Rowe ("the victim"). As a result his actions, a Bedford County grand jury indicted the Defendant for aggravated assault, a Class C felony, and aggravated kidnapping, a Class B felony. See Tenn. Code Ann. §§ 39-13-102, -304.

At the Defendant's trial on these charges, the parties presented the following evidence: The victim and the Defendant began dating in early 2013 and got an apartment together in Shelbyville in October 2013. The victim described their relationship as "[t]errible" and stated that the Defendant was "very controlling" and beat her "all the time."

The victim testified that, on the evening of November 1, 2013, she and the Defendant argued over money when she discovered that money was missing from her account where she received her social security disability payments. The Defendant admitted to taking all of the money out of the victim's account and buying crack cocaine with it. According to the victim, she was the only one with any income, and she, therefore, kept asking the Defendant how he proposed to pay their bills, which were due. According to the victim, the verbal disagreement, which began around 7:00 or 8:00 p.m., continued past midnight into November 2.

The Defendant was sitting on the couch smoking crack cocaine when the argument started up again. According to the victim, it turned physical when he got up and punched her in the face. The victim testified that, after this hit, she ran away from the Defendant and started beating on the walls yelling "help" in an attempt to grab a neighbor's attention. When she moved for the front door, the Defendant grabbed her by the neck with both hands and pressed his thumbs on the center of her throat. The victim, who had previously had "a [metal] plate, two screws[,] and [a] donor bone[,]" surgically implanted in her neck as the result of a car accident when she was a teenager, believed that the Defendant was trying to paralyze her—she stated that he was applying pressure "really hard" to the scar on her neck where he knew she had the plate and screws. The victim also testified that she suffered from degenerative disk disease and spinal stenosis. According to the victim, the Defendant's grip on her neck was very painful and caused her to have difficulty breathing.

When the Defendant finally let go of the victim, he punched her hard in the eye, causing her to go "flying back" onto the kitchen floor. The victim said that she was "crying and hollering" because the hit to her eye caused "[a] lot of pain" and that her back "was in excruciating pain" from hitting the floor.

The Defendant then dragged the victim into the bathroom of their bedroom where he placed his foot on her head, trying to her hold her down while she screamed. She stated that she was unable to breathe as a result. According to the victim, the Defendant then began "jerking" her head, which pulled some of her hair out. When she was able to turn her head to the side, she begged the Defendant to stop. When he finally stopped, the victim asked to leave, even offering the Defendant money to let her go; however, the Defendant refused to let her go until the bruising on her face subsided. She agreed to stay

so the beating would cease, feeling that she had no other options. The victim opined that, if she had tried to leave, she "probably would have been killed."

After the physical altercation subsided, the Defendant and the victim went to bed. He made her promise not to leave. Once the Defendant was asleep, the victim crawled onto the floor and obtained the Defendant's cell phone. The victim testified that she crept into the laundry room where she called her sister, Sharon Tyree, sometime between 3:00 and 4:00 a.m., to come pick her up because the Defendant had beat her up again. The victim then snuck out of the apartment and began walking, trying to avoid detection in case the Defendant had awakened and was coming after her. According to the victim, she hid in the "dark spots" until her sister arrived.

When Ms. Tyree encountered the victim, she saw that the victim's face was badly bruised and her eye was swollen from the beating, so she took the victim to the emergency room ("ER") at Maury County Regional Medical Center, arriving around 6:00 a.m. The victim was evaluated by April Pearl, an ER physician.

According to Dr. Pearl, the ninety-seven-pound victim reported that she had been punched, pushed, stomped, kicked, and choked by her boyfriend. The victim also reported that she had been seen in the ER previously due to an assault. Due to the victim's injuries, Dr. Pearl had a CAT scan done of the victim's head and x-rays of her ribs. Dr. Pearl determined that there was "soft-tissue swelling" around the victim's eye but no facial broken bones. Dr. Pearl explained that soft-tissue swelling usually dissipates within twenty-four to forty-eight hours after the injury occurs; so in Dr. Pearl's opinion, the eye injury had been recently inflicted, and the victim's explanation of her injuries was consistent with what Dr. Pearl had observed. Dr. Pearl also did not believe that the victim's eye injury was likely to have occurred during a car accident. The victim was released from the hospital later that morning around 9:00 a.m.

After the emergency room visit, the victim went to her parents' house. The victim's mother thereafter escorted the victim to the Shelbyville Police Department ("SPD"), where the victim reported the Defendant's abuse to Officer Bobby Peacock.

Officer Peacock testified that the victim had visible, recent injuries when she arrived at the police station—a "prominent black eye[,]" "red marks" on her neck around a healed surgical incision, bruising on her arm and shoulder, and thinned hair spots where it appeared her hair had been ripped out. He photographed these injuries, which were admitted as trial exhibits. Officer Peacock obtained a warrant for the Defendant's arrest.

SPD Detective Carol Jean obtained a written statement from the victim on April 14, 2014, at the request of the District Attorney's Office. Det. Jean reported that the victim identified the Defendant as the cause of her November 2013 injuries.

At trial, the victim admitted that she had been smoking crack cocaine with the Defendant the night of the argument. She also acknowledged that she returned to the relationship following the November 2013 beating and that she had "take[n] up for him" after his arrest. On cross-examination, the victim conceded that she spoke with the Defendant's lawyer in general sessions court several months prior to trial and that, when questioned by the Defendant's attorney at that time, she denied the allegations of abuse, stating to him that the Defendant had not kidnapped her or beaten her. She confirmed that she was in a car accident on Halloween night and agreed that she had told the Defendant's brother that her face was injured in the wreck. Furthermore, the victim acknowledged that she wrote a letter on December 18, 2013, wherein she stated that the Defendant did not cause her injuries. According to the victim, the Defendant's mother escorted her to a notary public, where the victim's signature was notarized. The victim explained that it was not her idea to write the letter but that she authored the letter anyway "to keep the beatings down" and because the Defendant was threatening her family.

The defense presented the Defendant's brother, Anthony Dewayne Polly, who testified that he was at a friend's house on October 31, 2013, when he received a call that the victim and the Defendant had been involved in a car accident. He sent his girlfriend to pick them up. When the victim and the Defendant arrived, they purchased some crack cocaine and began smoking it. Mr. Polly observed that the victim's right eye was red, and she was complaining of pain in her shoulder. According to Mr. Polly, the victim explained that she had been injured during the car accident. He and his girlfriend drove the couple back to Shelbyville that evening.

The Defendant testified on his own behalf, stating that he first met the victim when he sold her some pills. He claimed that he "hustled pretty good money" and "made pretty good money just piddling." He also said that he and the victim smoked about $4,000-worth of crack cocaine monthly. According to the Defendant, his relationship with the victim was "wonderful" at first but became difficult due to the victim's worsening drug addiction.

He denied the allegations of abuse and claimed that the victim's injuries resulted from the Halloween car wreck. According to the Defendant, his car was totaled in the accident and had to be towed from the scene. He further maintained that they argued on November 1, 2013, because he refused to go buy more crack cocaine for the victim. Regarding the victim's disability account, the Defendant stated that he never had access

to it because the victim's mother was the only one with access to it at that time. While he agreed that there was pushing and shoving that evening, he asserted that he never hit the victim in the eye or stomped her head. According to the Defendant, he did not pull out the victim's hair but instead posited that her thinned spots were from where she had previously gotten gum stuck in it. He also claimed that the victim was free to leave at any time during the disagreement. The Defendant explained that, if he "wanted to her hold against her will to keep her from leaving," then he "would have hogtied her" and "gagged her[.]"

The Defendant testified that he did not coach the victim or tell her what to say in the notarized letter. He also denied ever threatening the victim's family. The Defendant claimed that the victim's mother did not like him and insinuated that her mother took the victim to the police station to "put the charges" on him.

 Following the conclusion of proof, the Defendant was convicted as charged. Thereafter, the trial court sentenced him to fifteen years for the aggravated assault conviction and twenty years for the aggravated kidnapping conviction. The trial court further ordered that the two sentences be served consecutively to one another, resulting in an effective sentence of thirty-five years' incarceration.

This timely appeal followed. On appeal, the Defendant takes exception to the sufficiency of the convicting evidence and the length of his effective sentence.

## ANALYSIS

### I. Sufficiency of the Evidence

First, the Defendant argues that the evidence is insufficient to support his convictions. In a two-sentence argument, the Defendant claims that the evidence is insufficient because the victim made statements denying the Defendant's guilt and attributing her injuries to the Halloween car accident. The State responds that "[t]his proof was considered by the jury and cannot be a basis for rendering the evidence insufficient."

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness

credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Here, the Defendant was charged with aggravated assault by strangulation. As relevant to this case, the State was required to prove (1) that the Defendant either intentionally or knowingly caused another to reasonably fear imminent bodily injury; and (2) that the act "[w]as intended to cause bodily injury to another by strangulation or bodily injury by strangulation was attempted." See Tenn. Code Ann. §§ 39-13-101(a)(2), -102 (a)(1)(A)(iv) (2013). "[S]trangulation" is defined as "impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person." See Tenn. Code Ann. § 39-13-102(a)(2) (2013). Regarding the Defendant's aggravated kidnapping conviction, the State was required to show that the Defendant knowingly removed or confined the victim so as to interfere substantially with her liberty and that the victim suffered bodily injury. See Tenn. Code Ann. §§ 39-13-302(a), -304(a)(4).[1]

In this case, the victim testified that she and the Defendant began arguing after he had taken her money to purchase drugs. The argument eventually turned physical when he punched her in the face. She testified that she tried beating on the apartment walls to summon help from a neighbor. When the victim headed for the front door, the Defendant wrapped both hands around her neck and began to apply pressure, deliberately squeezing hard around a surgical scar that the Defendant knew was vulnerable. The victim testified that she was in pain and found it hard to breathe; she believed he was trying to paralyze her. When he finally let go, he hit her in the eye, knocking her to the floor. He then

---

[1] We note that the instruction outlined by our supreme court in State v. White, 362 S.W.3d 559, 580-81 (Tenn. 2012), was given to the jury in this case.

dragged her into the bathroom of the bedroom where the assault continued—he stomped on her head and ripped out her hair. She begged to leave, but he refused to let her go until the facial bruising subsided. The victim stated that she agreed because she was fearful the Defendant would kill her if she left. After the Defendant fell asleep some hours later, the victim was able to obtain his cell phone and call her sister to come pick her up. She snuck out of the house and walked away from the apartment, trying to be secretive as she went. When her sister picked her up on the roadside, she had visible injuries, and her sister took her to the ER, where the victim was evaluated by Dr. Pearl. Dr. Pearl opined that the victim's eye injury was recent and that it was unlikely due to a car accident. The victim reported the Defendant's abuse to Officer Peacock, and he noted injuries to the victim's face and redness to her neck. These injuries were observable in the photographs admitted at trial. Also, in April 2014, the victim told Det. Jean that the Defendant was the source of these injuries.

The Defendant's challenge to the sufficiency of the evidence is in effect a request for this court to reevaluate the credibility of the witnesses. The Defendant notes the victim's various statements that the Defendant did not commit these offenses. However, the victim admitted at trial that she had "take[n] up" for the Defendant following the incident by denying the allegations, and she explained to the jury why she made those statements—"to keep the beatings down" and because the Defendant was threatening her family. The evaluation of the victim's credibility is entrusted to the jury and may not be usurped by this court on appeal. See Bland, 958 S.W.2d at 659. The jury credited the victim's testimony, and the testimony of other witnesses and the physical evidence corroborated her account of the crime. This court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. We conclude that the evidence is sufficient to sustain the Defendant's convictions for aggravated assault and aggravated kidnapping.

## II. Sentencing

On appeal, the Defendant argues that the trial court imposed an excessive sentence that was contrary to law. The State responds that the trial court imposed an effective sentence consistent with the purposes and principles of the Sentencing Act and that the Defendant has failed to overcome the presumption of reasonableness afforded that decision or show that the trial court abused its discretion. We agree with the State.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to

Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Moreover, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2007). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In accordance with the broad discretion now afforded a trial court's sentencing decision, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). Carter, 254 S.W.3d at 344.

Furthermore, our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). Tenn. Code Ann. § 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Pollard, 432 S.W.3d at 861. Moreover, "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense,"

"no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).

In asserting that his sentence is excessive, the Defendant does not contest the trial court's application of any one of the enhancement factors or the criteria used to support consecutive sentencing. Instead, in his minimal argument, the Defendant claims that the trial court failed to consider the sentencing principles and purposes codified at Tennessee Code Annotated sections 40-35-102 and 40-35-103, asserting that "the punishment imposed does not fit the crime or the offender." He further argues that having him serve thirty-five years in confinement is a waste of the State's financial resources "that could be better used for violent criminals."

Here, the trial court found the Defendant to be a Range II, multiple offender for the Class B felony conviction (aggravated kidnapping) and a Range III, persistent offender for the Class C felony conviction (aggravated assault). In setting the length of the Defendant's sentences to the maximum in each range, the trial court considered as enhancement factors the Defendant's previous history of criminal convictions in addition to those necessary to establish the appropriate range; that the Defendant previously failed to comply with conditions of a sentence involving release into the community; and that the Defendant committed a delinquent act that would constitute a felony if committed by an adult. See Tenn. Code Ann. § 40-35-114(1), (8), & (16). The court noted that the Defendant had nineteen prior felony convictions and "about [twenty-three] misdemeanors of various combinations." Additionally, the Defendant had a grand larceny adjudication as a juvenile in 1986. The court also determined that the Defendant had at least six prior revocations of probation or parole. We conclude that the presentence report abundantly supports the application of these factors.[2]

The trial court imposed consecutive sentencing, finding that the Defendant was an offender whose record of criminal activity was extensive and that he was a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(2), (4). We agree with the trial court that the Defendant's record of criminal activity is certainly extensive. The trial court also noted that the Defendant said to the presentence officer, "if he were not incarcerated[,] he would have killed [the victim]" and "his cousin[,]" who was involved in pending charges against the Defendant. Only one criterion need exist to support the appropriateness of consecutive sentencing. Pollard, 432 S.W.3d at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

---

[2] Given the edict from our supreme court in Bise, we find it unnecessary to address the additional factors applied, and seemingly only given minimal weight, by the trial court.

Our review of the sentencing hearing transcript indicates that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a consecutive, within-range sentence of confinement in this case. As for the Defendant's argument about the cost of his incarceration, it neither overcomes the presumption of reasonableness nor demonstrates an abuse of the trial court's discretion. Therefore, the Defendant has failed to establish that the trial court abused its discretion in imposing an effective thirty-five-year sentence, and he is not entitled to relief.

<u>CONCLUSION</u>

Upon consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions and sentence.

_____
D. KELLY THOMAS, JR., JUDGE